THE THOMAS COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, Shernika Holton, Gladys Shotwell, Spencer Wilson, Sandra McIntyre, Mary Hill, Willie Mae Lewis, Jennifer Hightower, Evelyn Wilkerson, Sharon Bostick, Audrey Linder, and Lisa Webb, Plaintiffs

v.

CITY OF THOMASVILLE SCHOOL DISTRICT, Defendant

No. 6:98–CV–63 (CDL).

United States District Court,
M.D. Georgia,
Thomasville Division.

Feb. 5, 2004.

Betty Walker–Lanier, Tifton, GA, La-verne Lewis Gaskins, Valdosta, GA, Paul Dieseth, Minneapolis, MN, Thomas J. Henderson, Tanya Blackwell, Mark A. Dann, Derek W. Black, Washington, DC, Leslie Marie Gross, Riverdale, GA, Charles C. Moore, Eric A. Ruzicka, Theresa M. Bevilacqua, Paul J. Robbennolt, Minneapolis, MN, for Plaintiffs.

Jerry A. Lumley, Macon, GA, for Defendant.

## ORDER

LAND, District Judge.

The Court tried the above-captioned school desegregation case without a jury beginning on July 21, 2003, and ending on August 6, 2003. Based upon the evidence presented, the Court finds in favor of Defendant.

## I. BACKGROUND

To fully understand the context in which the Court makes its specific findings of fact and conclusions of law, it is necessary to review preliminarily the contentions of the parties, the procedural posture of this

case, and the evolution of the law relating to the desegregation of public schools in this country.

## A. The Parties' Contentions

Plaintiffs, on behalf of black[1] children attending the public elementary, middle, and high schools operated by the City of Thomasville School District ("the District"), filed this lawsuit in 1998. They contend that the District operates and maintains a racially segregated school system that deprives black students of their constitutional right to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution. U.S. Const. amend. 14. In addition, Plaintiffs contend that the District's actions violate Title VI of the Civil Rights Act of 1964. 42 U.S.C.A. § 2000d *et seq.* (West 2003); *see also* 34 C.F.R. pt. 100 (implementing regulations for Title VI).[2]

It is undisputed that the District operated a *de jure* racially segregated public school system in 1954 when the United States Supreme Court declared such systems unconstitutional in *Brown v. Board of Education.* 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954). It is also undisputed that prior to the filing of this lawsuit, no litigation had ever been instituted pursuant to *Brown* and its progeny challenging the alleged segregation of the District's schools. Consequently, there has been no opportunity for any court to determine whether the District has eliminated the vestiges of its previous *de jure* segregated system.

Plaintiffs maintain that subsequent to *Brown* the District never effectively desegregated its school system and that the District failed to eliminate the vestiges of its previous *de jure* racially segregated school system. Plaintiffs further contend that the District's school system is still racially segregated today, fifty years after racially segregated schools were declared unconstitutional by the Supreme Court. As a result of this segregation, Plaintiffs argue that black children who attend the District's schools are not being provided with the same educational opportunities as similarly situated white children.

The District contends that it first began desegregating its public schools in 1965 (Pls.' Ex. 197), that the Office of Civil Rights within the United States Department of Health, Education & Welfare ("HEW") approved its desegregation plan in 1970 (Pls.' Ex. 291), and that, as of 1975, its public schools were effectively desegregated with no vestiges of the previous segregated system. (Pls.' Ex. 350 at 2.) The District strongly disputes Plaintiffs' contention that it presently engages in purposeful discrimination resulting in ra-

---

1. There has been inconsistency among experts, lay witnesses, lawyers, and the courts as to whether it is more appropriate to use "black" and "white" or "African American" and "Caucasian." The Court has determined that the most appropriate racial descriptions for purposes of this Order are "black" and "white." These descriptions have the best symmetry, are effectively descriptive, and are hopefully inoffensive. *See* The American Heritage Book of English Usage: A practical and authoritative guide to contemporary English, 6. Names and Labels: Social, Racial, and Ethnic Terms, §§ 11 ("black"), 63 ("white") (1996), *available at* http://www.bartle-by.com/br/64.html (discussing continued preference for the term "black" among members of that minority group and the ongoing use of the terms "black" and "white").

2. Although it has been estimated that over four hundred school districts were still under federal court supervision as of 2001, *see* Edward Blum & Roger Clegg, *Pyrrhic Victory,* Fulton County Daily Report, Nov. 29, 2001, at 6, it appears that the above-captioned case may be the only pending school desegregation case in the country in which an initial determination of liability has not yet been made.

cial segregation. The District further maintains that any current racial imbalances within its school system are the result of demographic patterns or other factors beyond the District's control.

### B. Procedural Posture of the Case

Plaintiffs' Complaint contains claims under 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment as well as claims under Title VI of the Civil Rights Act of 1964. 42 U.S.C.A. § 2000d (West 2003). Subsequent to the filing of the lawsuit, the Court conditionally certified this case as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, defining the class as: "all present and future parents or guardians of African American children enrolled or eligible to be enrolled within the Thomasville City School District." *Thomas County Branch of N.A.A.C.P. v. Thomasville City Sch. Dist.*, 187 F.R.D. 690, 700 (M.D.Ga.1999). The Court later denied Defendant's Motion for Summary Judgment and Motion to Reconsider Conditionally–Certified Class. *Thomas County Branch of N.A.A.C.P. v. Thomasville City Sch. Dist.*, 2003 WL 169758 at *3 (M.D.Ga. Jan.21, 2003) (unre-

ported opinion). At the same time, the Court granted Plaintiff's Motion for Partial Summary Judgment, finding that under Eleventh Circuit precedent any present racial imbalances in the District are presumed to be the result of previous *de jure* segregation.[3] *Id.* at *2 (citing *NAACP, Jacksonville Branch v. Duval County Sch.*, 273 F.3d 960, 966 (11th Cir. 2001), *reh'g en banc denied* 31 Fed. Appx. 943, 2002 WL 338731 (11th Cir.2002) (tbl.opin.); *Manning v. Sch. Bd.*, 244 F.3d 927, 942 (11th Cir.2001)). The Court further found that this presumption is rebuttable and that the District had the burden at trial of showing that any present racial imbalances are not traceable, in a proximate way, to the previous system. *Id.*

### C. Brown and Its Progeny

#### 1. Brown I—Identifying the Constitutional Violation

May 17, 2004 marks the fiftieth anniversary of the Supreme Court's landmark decision in *Brown v. Board of Education.* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*). In *Brown I*, the Court found "separate but equal" to be irreconcilable with the Fourteenth Amendment, declaring that "in the field of public edu-

---

**3.** Although recognizing its duty to follow Eleventh Circuit precedent, this Court expressed strong reservations about the applicability of this legal presumption in the present case:

> Although the passage of time alone cannot be found to cleanse a school district of all vestiges of previous *de jure* racial segregation, it would appear that the validity of a legal *presumption* is by definition grounded upon a close connection between the underlying factual premise and the ultimate *presumed* legal conclusion. To completely disregard the passage of time between the *presumption's* underlying foundation and the resulting legal conclusion ignores important factors that may be more persuasive than the facts giving rise to the *presumption.* For

> example, ... this presumption would apply [even if] a responsible school system ... upon learning of the *Brown* decision moved forward voluntarily to dismantle its *de jure* segregated system ... [and even if] for thirty years this system did in fact maintain a unitary system, ... [but after thirty years,] due to demographic changes, racial imbalances occurred within the system .... [T]he Court would [still] be required to *presume* that any current racial imbalances were the result of the *de jure* segregated system, a system that was justifiably killed thirty years earlier only to be resurrected by a *legal presumption.*

> *Thomas County Branch of N.A.A.C.P.*, 2003 WL 169758 at *2 n. 2.

cation the doctrine of 'separate but equal' has no place." [4]  *Id.* at 495, 74 S.Ct. 686. Accordingly, the Court held that "the segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive[s] the children of the minority group of equal educational opportunities," in violation of the Fourteenth Amendment's guaranty of equal protection of the laws.  *Id.* at 493, 74 S.Ct. 686.[5]

4.  In *Brown I*, the Supreme Court overruled *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), which for the preceding fifty-eight years had given legal sanction to the segregation of persons based solely upon their race.  In *Plessy*, the Supreme Court, notwithstanding the abolition of slavery and the adoption of the Thirteenth and Fourteenth Amendments to the Constitution, upheld a Louisiana law that required railroads to provide their passengers with equal but separate accommodations based solely upon their race.  *Id.* at 542, 550–51, 16 S.Ct. 1138.  Justice Harlan, in his eloquent (and prescient) dissent, described the irreconcilability of legally sanctioned racial segregation with the promise of equal opportunity guaranteed by the Constitution:

> The thirteenth amendment does not permit the withholding or the deprivation of any right necessarily inhering in freedom. It not only struck down the institution of slavery . . . , but it prevents the imposition of any burdens or disabilities that constitute badges of slavery or servitude.  It decreed universal civil freedom in this country. . . . [I]t was followed by the fourteenth amendment, which added greatly to the dignity and glory of American citizenship, and to the security of personal liberty, by declaring that "all persons born or naturalized in the United States . . . are citizens . . ." and that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Finally, and to the end that no citizen should be denied, on account of his race, the privilege of participating in the political control of his country, it was declared by the fifteenth amendment that "the right of citizens . . . to vote shall not be denied or abridged by the United States or by any state on account of race, color or previous condition of servitude." These notable additions to the fundamental law were welcomed by the friends of liberty throughout the world.  They removed the race line from our governmental systems.  They had . . . a common purpose, namely, to secure "to a race recently emancipated, a race that through many generations have been held in slavery, all the civil rights that the superior race enjoy." They declared . . . "that the law in the states shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the states; and in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against by law because of their color."

*Id.* at 555–56, 16 S.Ct. 1138 (citations for internal quotations omitted).

In Justice Harlan's inimitable words, "[o]ur constitution is color-blind, and neither knows nor tolerates classes among citizens.  In respect of civil rights, all citizens are equal before the law.  The humblest is the peer of the most powerful."  *Id.* at 559, 16 S.Ct. 1138.  "The destinies of the two races, in this country, are indissolubly linked together, and the interests of both require that the common government of all shall not permit the seeds of race hate to be planted under the sanction of law."  *Id.* at 560, 16 S.Ct. 1138.

Although Justice Harlan did not carry the day in *Plessy*, his prediction that "the judgment this day rendered will, in time, prove to be quite as pernicious as the decision made by this tribunal in the Dred Scott Case," *id.* at 559, 16 S.Ct. 1138, ultimately proved true, with Justice Harlan's formal vindication arriving over a half a century later in *Brown I*.

5.  In reaching this conclusion, the Court noted the importance of public education in this country:

> Today, education is perhaps the most important function of state and local governments.  Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society.  It is required in the per-

### 2. Brown II—*Establishing a Remedy*

Identifying the constitutional violation was the easy part. One year after deciding *Brown I* the Supreme Court began the difficult task of providing guidance to the lower courts as to how to implement its ruling. *See Brown v. Bd. of Educ.*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*). The Court, understanding the importance of local control of public schools, showed considerable restraint and patience, at least initially. However, this restraint produced few specific guidelines for the lower courts. Instead, the Supreme Court seemed content to give lower courts considerable discretion, explaining only that "[i]n fashioning and effectuating the decrees, the courts will be guided by equitable principles," *id.* at 300, 75 S.Ct. 753, and that the courts should issue such orders and decrees as are "necessary and proper to admit [students] to public schools on a racially non-

discriminatory basis." *Id.* at 301, 75 S.Ct. 753. The only time constraint placed on local school officials was that they desegregate their schools "*with all deliberate speed.*" *Id.* (emphasis added).

Many school systems (and politicians) used this indefinite guidance to delay the implementation of what at the time was a controversial change in public policy. As a result, in the years that followed, the Supreme Court docket became crowded with cases in which the lower courts on the front line had struggled to apply the legal principles emanating from *Brown I* and *Brown II* to the realities of this country's school systems. *See, e.g., Cooper v. Aaron*, 358 U.S. 1, 4, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (noting the governor and legislature of the State of Arkansas claimed that "there is no duty on state officials to obey federal court orders resting on [the Supreme] Court's considered interpretation of the United States Constitution"); [6] *Grif-*

---

formance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today, it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.
*Brown I*, 347 U.S. at 493, 74 S.Ct. 686.

**6.** The situation in Arkansas vividly demonstrates the controversial nature of the *Brown I* decision at the time. While the local school board was going forward with a plan to desegregate the Little Rock school system, other authorities in the state were actively attempting to perpetuate racial segregation. First, in November of 1956, an amendment to the state's constitution commanded the legislature to oppose the " 'unconstitutional desegregation decisions' " handed down in *Brown I* and *Brown II. Cooper*, 358 U.S. at 8–9, 78 S.Ct. 1401 (quoting Ark. Const. amend. 44).

The school board nevertheless proceeded with the first stage of implementing its desegregation plan, which included the admission of "[n]ine Negro children" to the previously all white high school. *Id.* at 9, 78 S.Ct. 1401. On September 2, 1957, the day before these students were to be admitted, "the Governor of Arkansas dispatched units of the Arkansas National Guard" to the high school and "placed the school 'off limits' to colored students." *Id.* As the children attempted to enter the school on September 4, 1957, "units of the Arkansas National Guard, 'acting pursuant to the Governor's order, stood shoulder to shoulder at the school grounds and thereby forcibly prevented the ... children from entering.' " *Id.* at 11, 78 S.Ct. 1401. This spectacle continued every school day during the following three weeks. *Id.* The district court subsequently issued a preliminary injunction on September 20, 1957, enjoining the governor and the National Guard officers from preventing the attendance of the black children at the school. *Id.* at 11–12, 78 S.Ct. 1401. The National Guard was then withdrawn from the school. *Id.* at 12, 78 S.Ct. 1401. The next school day, Monday, September 23, 1957, the black children entered

*fin v. County Sch. Bd.*, 377 U.S. 218, 221, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) (indicating a county school board in Virginia closed its public schools and funded private schools for whites to avoid desegregation requirements of *Brown I and II* ).[7]

the school under the protection of the Little Rock Police Department and members of the Arkansas State Police. *Id.* However, the children were removed during the morning because of the large crowd demonstrating outside the school. *Id.* On September 25, the President of the United States dispatched federal troops to the high school and the students were admitted to the school. *Id.* Regular army troops continued their presence at the high school until November 27, 1957. *Id.* They were then replaced by federalized National Guardsmen who remained for the rest of the school year. *Id.* Eight of the black students remained in attendance at the end of the year. *Id.*

7. Joining the southern outcry against the "federalizing" of public schools, Georgia politicians throughout the 1950s and 1960s strongly denounced desegregation. *See Bd. of Pub. Educ. v. Georgia*, 1992 WL 699499, at *2 (S.D.Ga.1992) (wherein Judge Edenfield provides a history of Georgia's resistance to school desegregation). Although Georgia governors did not defiantly stand in schoolhouse doors or call out the militia, they worked, along with the state's legislature, within the legal and legislative process to prevent integration of the schools. *Id.* at *2–4.

The Georgia General Assembly enacted legislation in 1955 that restricted state education funds only to schools "in which the white and colored races are separately educated." *Id.* (quoting 1955 Ga. Laws 174). The General Assembly also passed legislation declaring the Supreme Court's decisions in *Brown I and II* and similar decisions "null, void and of no effect" in Georgia. *Id.* (quoting 1956 Ga. Laws 642). Some have even suggested that the General Assembly changed the state flag in 1956, adding the St. Andrew's Cross to commemorate Georgia's connection to the Confederacy, in defiance of the federal government's attempt to force integration upon the South. *See Coleman v. Miller*, 117 F.3d 527, 528 (11th Cir.1997) (per curiam) (involving challenge to constitutionality of 1956

### 3. The Civil Rights Act of 1964

Congress ultimately became concerned with the lack of progress and included provisions in the Civil Rights Act of 1964 to address school desegregation. *See* Pub.L. 88–352, §§ 401–10, 601–05, 78 Stat.

Georgia flag by a black plaintiff and discussing history of the Georgia flag).

"Until 1961, state and local efforts to block desegregation in Georgia were completely successful." *Bd. of Pub. Educ.*, 1992 WL 699499 at *3. That year, the Fifth Circuit Court of Appeals ordered the University of Georgia to admit two black students. *Id.* Faced with the choice of closing the university because of the School Closing Laws, *see* 1956 Ga. Laws 6, 1959 Ga. Laws 15, or repealing the laws prohibiting the funding of integrated schools, the Governor and General Assembly relented and repealed many of Georgia's segregation laws to avoid the closing of the University of Georgia. *Bd. of Pub. Educ.*, 1992 WL 699499 at *3 (citing 1961 Ga. Laws 35).

Georgia's Governor, Ernest Vandiver, supported the repeal of these laws to avoid the closing of the University of Georgia and to avoid the turmoil that would be caused by extensive litigation. *See id.* However, these repeals did not signal the end of Georgia's resistance to desegregation efforts. To further avoid desegregation litigation, the General Assembly decentralized Georgia's schools to force civil rights litigants to sue every school district individually to achieve compliance with *Brown*. *Id.* Moreover, state officials offered legal services to local school boards defending desegregation lawsuits. *Id.* The General Assembly also provided tuition grants for students who chose to attend private, segregated schools. *Id.*

One should not conclude, however, that resistance to the mandates of *Brown* and its progeny was restricted to the South. *See, e.g., Keyes v. School Dist. No. 1, Denver, Colorado*, 413 U.S. 189, 218, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (Powell, J. concurring in part and dissenting in part) ("Unwilling and footdragging [sic] as the process was in most places, substantial progress toward achieving integration has been made in Southern States. No comparable progress has been made in many nonsouthern cities with large minority populations ....").

246–49, 252–53 (1964) (current version codified as amended at 42 U.S.C.A. §§ 2000c et seq., 2000d et seq. (West 2003)). Congress declared in Title VI of that Act that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C.A. § 2000d. HEW issued regulations pursuant to Title VI which addressed racial discrimination in federally assisted school systems. Specifically, HEW's Office of Education established standards for school systems in the process of desegregation to remain qualified for federal funds. See 45 CFR §§ 80.1–80.13 (2003). Meanwhile, HEW's Office of Civil Rights was responsible for enforcing Title VI of the Civil Rights Act of 1964. See Paisey v. Vitale, in and for Broward County, Fla., 634 F.Supp. 741, 745 (S.D.Fla.1986) (noting Office of Civil Rights' responsibility under Title VI).[8]

### 4. The Supreme Court Grows Impatient

The lack of progress in fully implementing its ruling in Brown I and II also began to test the Supreme Court's patience. In Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), the Court declared that "the time for mere 'deliberate speed' has run out." Id. at 234, 84 S.Ct. 1226.[9] The Court later reiterated in Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968),

that delays in dismantling dual segregated school systems were no longer tolerable given the fact that the "governing constitutional principles [of Brown I and II] no longer bear the imprint of newly enunciated doctrine." Id. at 438, 88 S.Ct. 1689 (internal quotations omitted). The Court made it clear that "the burden on a school board ... is to come forward with a plan that promises realistically to work, and promises realistically to work now." Id. at 439, 88 S.Ct. 1689. As explained by the Court, "it is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation." Id. "The obligation of the district courts ... is to assess the effectiveness of a proposed plan in achieving desegregation." Id. "Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief." Id. The Supreme Court recognized that "whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed," to use the Court's phrase "root and branch." Id. at 438, 88 S.Ct. 1689. Finally, the Court reminded everyone that the obligation of dismantling dual segregated systems fell upon local school boards and could not be placed upon school children and their parents. Id. at 441–42, 88 S.Ct. 1689.[10]

8. HEW's Office of Education and Office for Civil Rights have since become part of the Department of Education.

9. The Supreme Court had originally recognized the difficult task and " 'complexities arising from the transition to a system of public education freed of racial discrimination,' " and thus "provided for 'all deliberate speed' in the implementation of the principles

of Brown I." Green, 391 U.S. at 436, 88 S.Ct. 1689 (citation omitted). As the bright light of Brown began to dim, the Court recognized that deliberate speed was too slow.

10. In Green, the school board had submitted a "freedom of choice" desegregation plan which allowed students to choose their own school. 391 U.S. at 431–32, 88 S.Ct. 1689. Although it did not reject "choice" as a means

### 5. More Guidance from the Supreme Court

After making it clear that school systems needed to pick up the pace of their desegregation efforts,[11] the Court found it necessary to provide more specific guidance to the lower courts and school boards in their design and evaluation of desegregation plans. Building upon *Green*, the Court set forth specific evaluation criteria for the first time in *Swann v. Charlotte–Mecklenburg Board of Education.* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).[12] The Court premised its ruling upon the objective "to eliminate from the public schools all vestiges of state-imposed segregation." *Id.* at 15, 91 S.Ct. 1267. If school authorities failed to take affirmative steps to convert their dual systems into a unitary one in which racial discrimination has been eliminated "root and branch," judicial authority could be invoked. *Id.* (citing *Green*, 391 U.S. at 437–38, 88 S.Ct. 1689). "Once a right and violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Id.* However, "[r]emedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults." *Id.* at 16, 91 S.Ct. 1267.

The Court reiterated in *Swann* that "existing policy and practice with regard to faculty, staff, transportation, extracurricular activities, and facilities [are] among the most important indicia of a segregated system." *Id.* at 18, 91 S.Ct. 1267 (citing *Green*, 391 U.S. at 435, 88 S.Ct. 1689). Moreover, as explained by the Court, a *prima facie* case of violation of the Equal Protection Clause is shown when "it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff,

for effectively desegregating the schools, the Court held that choice in and of itself was not the silver bullet to end state-sponsored segregation. Instead, the courts must measure the effectiveness of any choice plan in achieving desegregation. *Id.* at 437, 440–41, 88 S.Ct. 1689. The *Green* Court described several factors for courts to consider in evaluating whether a plan is effective in dismantling the segregated system. Those factors are: student assignment, faculty, staff, transportation, extracurricular activities, and facilities. *Id.* at 435, 88 S.Ct. 1689. These factors have become commonly known as the *"Green* factors." *See, e.g., Freeman v. Pitts*, 503 U.S. 467, 486, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) (discussing role of *Green* factors in desegregation cases).

11. *See Alexander v. Holmes County Bd. of Educ.*, 396 U.S. 1218, 1219, 90 S.Ct. 14, 24 L.Ed.2d 41 (1969) (Justice Black, in his denial of a school board's application to vacate suspension of an order requiring submission of accelerated desegregation plans, nevertheless explained that " 'all deliberate speed' has turned out to be only a soft euphemism for delay"); *see also Alexander v. Holmes County Bd. of Educ.*, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969) (per curiam) ("[C]ontinued operation of segregated schools under a standard of allowing 'all deliberate speed' for desegregation is no longer constitutionally permissible .... [T]he obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools.") (citations omitted).

12. The Court explained the necessity of providing lower courts and school districts with more guidance: "The problems encountered by the district courts and courts of appeals make plain that we should now try to amplify guidelines, however incomplete and imperfect, for the assistance of school authorities and courts." *Swann*, 402 U.S. at 14, 91 S.Ct. 1267. As recognized by the Supreme Court, while *"Brown I* ... appropriately dealt with the large constitutional principles; other federal courts had to grapple with the flinty, intractable realities of day-to-day implementation of those constitutional commands." *Id.* at 6, 91 S.Ct. 1267.

the quality of school buildings and equipment, or the organization of sports activities." *Id.* "When a system has been dual in these respects, the first remedial responsibility of school authorities is to eliminate invidious racial distinctions." *Id.* In the areas of support staff, transportation, extracurricular activities, maintenance of buildings, and distribution of equipment, normal administrative practices should produce schools of like quality, facilities, and staff. *Id.* at 18–19, 91 S.Ct. 1267.

Further evaluation must be done, however, with regard to faculty assignment, new school construction, and student assignment. In this regard, the *Swann* Court held that the district courts had the equitable power to order the assignment of teachers "to achieve a particular degree of faculty desegregation." *Id.* at 19, 91 S.Ct. 1267. The Court also held that the district courts had the authority to monitor school construction and the abandonment of existing schools to make sure construction programs were not used to perpetuate or reestablish the dual system. *Id.* at 20–21, 91 S.Ct. 1267.

In addressing the issue of student assignment, the Court attempted to distinguish the courts' responsibility to remedy state-sanctioned segregation using methods to achieve more racial balance from the related, but legally inappropriate, temptation to achieve racial balance in the schools for the sole purpose of achieving balance even if the imbalance could not be traced to the dual system. *Id.* at 22, 91 S.Ct. 1267. As explained by the Court,

> We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds. The target of the cases from Brown I to the present was the dual school system. The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage. It would not serve the important objective of Brown I to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination.

*Id.* at 22–23, 91 S.Ct. 1267.

The objective in desegregation cases, as recognized by the Court in *Swann*, is not to address and remedy all problems associated with racial prejudice, "even when those problems contribute to disproportionate racial concentrations in some schools." *Id.* at 23, 91 S.Ct. 1267. "The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Id.* at 24, 91 S.Ct. 1267. Although mathematical ratios relating to student composition may be helpful in shaping a remedy, the school system's remedial plan is ultimately to be judged by its effectiveness. *Id.* at 25, 91 S.Ct. 1267. Thus, "the existence of some small number of one-race, or virtually one-race, schools . . . is not in and of itself the mark of a system that still practices segregation by law." *Id.* at 26, 91 S.Ct. 1267. However, the Court continued,

> [I]n a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to

a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.

*Id.*

The Court emphasized that "neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action eliminated from the system." *Id.* at 32, 91 S.Ct. 1267. "[I]n the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary." *Id.*

Subsequent to the Supreme Court's decision in *Swann,* school districts sought approval of desegregation plans consistent with the *Swann* requirements. After a period of judicial supervision, such districts sought a declaration of unitary status so that they could be relieved from court supervision. Unitary status litigation consumed much of the desegregation jurisprudence for the next twenty years. Throughout that litigation, the courts struggled with the distinction between *de jure* and *de facto* segregation. This struggle is illustrated by Chief Justice Burger's dissent in *Wright v. Council of the City of Emporia,* 407 U.S. 451, 471, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972) (Burger, J. dissenting), which was joined by three other Justices. The Chief Justice, who

had authored the Court's unanimous opinion approximately one year earlier in *Swann,* rejected the notion that "racial balance is the norm to be sought," observing that "mere racial imbalance was [not] the condition requiring a judicial remedy." *Id.* at 473, 92 S.Ct. 2196. As explained by the Chief Justice,

Obsession with such minor statistical differences reflects the gravely mistaken view that a plan providing more consistent racial ratios is somehow more unitary than one which tolerates a lack of racial balance. Since the goal is to dismantle dual school systems rather than to reproduce in each classroom a microcosmic reflection of the racial proportions of a given geographical area, there is no basis for saying that a plan providing a uniform racial balance is more effective or constitutionally preferred. School authorities may wish to pursue that goal as a matter of policy, but we have made it plain that it is not constitutionally mandated.

*Id.* at 474, 92 S.Ct. 2196.

### 6. Current Racial Imbalances—the Keyes Presumption

■ Approximately one year later, in *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), the Court attempted to explain the distinction between *de jure* and *de facto* segregation. The Court explained that "the differentiating factor between de jure segregation and so-called de facto segregation ... is purpose or intent to segregate." *Id.* at 208, 93 S.Ct. 2686. The Supreme Court then clearly articulated, arguably for the first time, the burden of proof in school desegregation cases. The Court explained that if a school board has intentionally engaged in segregative actions in a meaningful portion of its system, then a presumption is created that any segregation within the system is the result of that intentional segregation. *Id.*

The burden then shifts to the school board "to disprove segregative intent ... [or show] that its past segregative acts did not create or contribute to the current segregated condition of the [school system]." *Id.* at 211, 93 S.Ct. 2686.

As more time passed, Courts consistently faced the difficult dilemma of deciding whether present racial imbalances could be traced to a school system's previous segregative conduct or were due to something beyond the school district's control. The Supreme Court addressed this issue in *Keyes* and rejected "any suggestion that remoteness in time has any relevance to the issue of intent." *Id.* at 210, 93 S.Ct. 2686. However, the Court did recognize that "at some point in time the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of de jure segregation warranting judicial intervention." *Id.* at 211, 93 S.Ct. 2686 (citing *Swann*, 402 U.S. at 31–32, 91 S.Ct. 1267). *But see Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (in which a divided court affirmed the lower court's tracing of segregation as of the late 1970s back to the system's purposefully dual system of the 1950s); *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) (same).[13] It appears that members of the current Court still do not agree on the effect of the passage of time on the determination as to the present impact of past *de jure* segregation. *Compare Gratz v. Bollinger*, 539 U.S. 244, 123 S.Ct. 2411, 2443, 156 L.Ed.2d 257 (2003) (Ginsburg, J. dissenting) (stating, in the context of higher education, "[b]ut we are not far distant from an overtly discriminatory past, and the effects of centuries of law-sanctioned inequality remain painfully evident in our communities and schools"), *with Freeman v. Pitts*, 503 U.S. 467, 506, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) (Scalia, J. concurring) ("At some time we must acknowledge that it has become absurd to assume, without any further proof, that violations of the Constitution dating from the days when Lyndon Johnson was President, or earlier, continue to have an appreciable effect upon current operations of schools.").

The focus of today's school desegregation jurisprudence, as evidenced by the case *sub judice*, is whether current racial imbalances are the result of practices that were declared illegal almost fifty years ago. With the foregoing background in mind, the Court answers this question for the Thomasville City Schools, making the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

The Court finds that the District does not presently engage in racial dis-

---

13. In the *Columbus Board of Education* case, the Court, using the presumption of segregative intent, found the school district had failed to carry its burden of rebutting that presumption. 443 U.S. at 467–68, 99 S.Ct. 2941. The dissent argued that the continued use of this presumption has erected an insurmountable burden for school systems to escape from judicial oversight. *Id.* at 492–508, 99 S.Ct. 2941. Suggesting that the Court had now established principles that create a litigation game that school systems could never win, Justice Rehnquist wrote:

A school system's only hope of avoiding a judicial receivership would be a voluntary dismantling of its neighborhood school program. If that is the Court's intent today, it has indeed accepted the role of Judge Learned Hand's feared 'Platonic Guardians,' and intellectual integrity—if not the Constitution or the interests of our beleaguered urban school systems and their students of all races—would be better served by discarding the pretextual distinction between *de facto* and *de jure* segregation. Whether the Court's result be reached by the approach of Pilate or Plato, I cannot subscribe to it.

*Id.* at 524, 99 S.Ct. 2941 (Rehnquist, J. dissenting).

crimination as prohibited by the Fourteenth Amendment and Title VI of the Civil Rights Act. The Court further finds that any racial imbalances that presently exist within the District are not traceable in a proximate way to the *de jure* racially segregated system that existed at the time *Brown I* was decided almost fifty years ago. The Court does find that racial imbalances presently exist within the District in certain areas. Under *Keyes* these racial imbalances are presumed to be vestiges of the previous *de jure* segregated system. However, as set forth hereinbelow, the Court finds that the District carried its burden of proof by rebutting that presumption.

In Section A of the findings of fact, the Court makes findings regarding the organization of the District's schools and the District's desegregation efforts in the years following *Brown I*. In Section B, the Court makes specific findings regarding areas of the District's operations that the Court finds presently contain racial imbalances. These areas include student population in the District's elementary schools, racial composition of individual classes within schools, faculty and staff assignments, the gifted and special education programs, and the administration of discipline. Finally, in Section C, the Court makes specific findings as to whether the District discriminates on the basis of race in other areas of its operations where no present racial imbalances exist. These areas are facilities, transportation, and extracurricular activities.[14]

### A. Organization of the District's Schools and the District's Desegregation Efforts

#### 1. De Jure Racially Segregated Schools

At the time *Brown I* was decided, the District operated a *de jure* racially segregated school system. Between 1954 and 1965, the District continued to operate separate schools for black and white students. The grades and races served by each school in the District as of 1965 were:

| School | Grades | Race |
| --- | --- | --- |
| Balfour | 1–6 | White |
| Douglass Elementary | 1–6 | Black |
| Dunlap | 1–6 | Black |
| East Side | 1–6 | White |
| Harper | 1–6 | White |
| Jerger | 1–6 | White |
| Douglass High | 7–12 | Black |
| MacIntyre Park | 7–12 | White |

(Stipulation of Facts ¶ 3.)

#### 2. The District's First Desegregation Plan

The District adopted its first desegregation plan in 1965 after the passage of the Civil Rights Act of 1964. *See* 42 U.S.C.A. § 2000d *et seq.*[15] This first plan was based upon freedom of choice and purported to allow parents to choose the school that their children would attend starting in the fall of 1965. (Test. of William M. Gordon,

14. The Court notes that the "areas" it has evaluated coincide with the *Green* factors, which are used by courts to analyze whether a school district's desegregation plan effectively dismantled a district's previous *de jure* racially segregated system. The Court finds this analytical framework helpful in determining whether the District's past desegregation efforts were effective and whether the present

system is unlawfully segregated on the basis of race.

15. The Civil Rights Act of 1964 authorized withholding federal funds from systems that did not comply with the Act, providing increased incentives for school systems to desegregate.

Tr. vol. IV at 29; Pls.' Ex. 197.) The plan was ineffective and failed to desegregate the District's schools. The three historically black schools—Douglass Elementary School, Dunlap Elementary School, and Douglass High School—remained all black. (Test. of Gordon, Tr. vol. IV at 29–32; Pls.' Ex. 1187a at 3, 14, 15.)

### 3. The District's 1970 Desegregation Plan

Between 1965 and 1970, the District had numerous exchanges with HEW regarding the District's compliance with Title VI. As part of these discussions, the District adopted a desegregation plan in 1970 ("the Desegregation Plan"). (Test. of David Armour, Tr. vol. X at 15; Pls.' Ex. 291.) The terms of the Desegregation Plan were as follows:

> [B]y September 1970, all of the schools in the Thomasville City System will be unitized and [ ] the following reorganizational steps will have been accomplished:
>
> 1. All pupils in the system in grades 9–12 will attend the MacIntyre Park High School.
>
> 2. All pupils in the system in grades 7 and 8 will attend the Middle School, housed in the Douglas [sic] Elementary and High School facilities.
>
> 3. All pupils in the system in grade 6 will attend the Dunlap School.
>
> 4. All pupils in the system in grade 5 will attend the East Side School.
>
> 5. All pupils in the system in grades 1–4 will attend the Balfour, Jerger, Scott and Harper Schools under a "freedom of choice" plan. If the "freedom of choice" plan does not eliminate the racial identifiability of each of the four elementary schools, alternate steps will be taken to give this assurance.

.　　.　　.　　.　　.

> 6. The faculty assignments in each school will generally reflect the racial ratio of the faculty in the school system as a whole.

(Test. of Armour, Tr. vol. X at 16–18; Pls.' Ex. 291.) HEW found that the Desegregation Plan would accomplish the purposes of Title VI and accepted the plan on July 1, 1970. (Pls.' Ex. 291.)

After the implementation of the Desegregation Plan, all students in grades 1–4, regardless of race, attended either Balfour, Harper, Jerger, or Scott Elementary Schools; all fifth grade students attended East Side; all sixth grade students attended Dunlap; all seventh and eighth grade students attended Douglass; and all high school students attended MacIntyre Park. Thus, beginning with the 1970–71 school year, the District's facilities were used in the following manner:

| School | Grades |
| --- | --- |
| Balfour | 1–4 |
| Harper | 1–4 |
| Jerger | 1–4 |
| Scott | 1–4 |
| East Side | 5 |
| Dunlap | 6 |
| Douglass | 7–8 |
| MacIntyre Park | 9–12 |

(Stipulation of Facts ¶ 4.)

### 4. Changes in 1975—Opening of Thomasville High School

Thomasville High School was opened at the beginning of the 1975–76 school year. At the same time, East Side was closed, Dunlap became the school system's facility for special education and kindergarten students, and MacIntyre Park became the school for fifth and sixth grade students. Beginning with the 1975–76 school year,

the District's facilities were used in the following manner:

| School | Grades |
| --- | --- |
| Dunlap | Special Education, K |
| Balfour | 1–4 |
| Harper | 1–4 |
| Jerger | 1–4 |
| Scott | 1–4 |
| MacIntyre Park | 5–6 |
| Douglass | 7–8 |
| Thomasville High | 9–12 |

(Stipulation of Facts ¶ 5.) The District operated in this manner until 1993.

#### 5. Changes from 1993 to Present—Closure of Balfour, Dunlap, and Douglass

Balfour and Dunlap were closed at the end of the 1992–93 school year.[16] (Stipulation of Facts ¶ 6.) At the same time, the use of the District's facilities was reorganized and, beginning with the 1993–94 school year, the facilities were used in the following manner:

| School | Grades |
| --- | --- |
| Douglass | K–5 |
| Harper | K–5 |
| Jerger | K–5 |
| Scott | K–5 |
| MacIntyre Park | 6–8 |
| Thomasville High | 9–12 |

(Stipulation of Facts ¶ 7.)

Douglass was subsequently closed at the end of the 2001–02 school year. The District currently operates three K–5 elemen-

**16.** Balfour was later reopened to house the District's pre-kindergarten program, and Dunlap was later reopened to house the alternative school program.

**17.** "Racial identifiability" means that, due to certain factors, including a percentage of one

tary schools (Harper, Jerger and Scott), one 6–8 middle school (MacIntyre Park), one 9–12 high school (Thomasville High), a pre-kindergarten program (formerly Balfour), and an alternative school program (formerly Dunlap). (Stipulation of Facts ¶ 8.)

### B. Current Racial Imbalances

The Court finds that racial imbalances currently exist in certain areas of the District's operations. Specifically, imbalances exist regarding the student populations in the District's elementary schools, the composition of some individual classes within the District's schools, the faculty assigned to the District's elementary schools, the staff assigned to some of the District's schools, the composition of the student population participating in the District's gifted and special education programs, and the number of students subjected to disciplinary actions. The Court examines each of these areas to determine whether the District has carried its burden of proof by proving by a preponderance of the evidence that these racial imbalances are not traceable in a proximate way to the District's previous de jure segregated system.

#### 1. Racial Identifiability of the District's Schools Based Upon Student Population

■ A review of the student populations of the District's elementary schools demonstrates that Harper and Jerger are currently racially identifiable schools.[17] The most recent racial breakdown of the District's elementary schools' student populations is as follows:

race of students or faculty in a school or class that is disproportionate to the percentage of that race in the system as a whole, a school is perceived as a "white school" or a "black school."

| | Percentage of Black Students | | | | |
|---|---|---|---|---|---|
| School Year | District [18] | Harper | Jerger | Scott | Douglass |
| 1999–2000 | 74.3 | 100 | 39.1 | 84.1 | 99.6 |
| 2000–01 | 75.2 | 100 | 40.3 | 88.6 | 100.0 |
| 2001–02 | 76.0 | 99.3 | 41.7 | 88.7 | 100.0 |
| 2002–03 | 73.6 | 98.5 | 39.8 | 90.0 | Closed |

(Pls.' Ex. 1187a.)

■ A variance of more than twenty percentage points between the district-wide percentage of black students in those grades represented by the school and the percentage of black students in an individual school is evidence that a school is racially identifiable. (Test. of Armour, Tr. vol. X at 22–23; Def's. Ex. 456.); *see also Adams v. Weinberger*, 391 F.Supp. 269, 271 (D.D.C.1975). Under this standard, which the Court finds reasonable, Harper is currently racially identifiable as a black school, and Jerger is identifiable as a white school. The Court previously found, albeit reluctantly, that the District had the burden of proving that these current racial imbalances are not traceable in a proximate way to the District's previous *de jure* segregated system. Based on the following, the Court finds that the District carried its burden.

No one disputes that all of the District's schools were racially identifiable prior to 1970. However, that began to change in the early 1970s. Pursuant to the District's Desegregation Plan, all high school students were assigned to one high school, and all middle school students were assigned to one middle school. Meanwhile, all students in fifth and sixth grade attended the individual schools designated to house each of these two grades. (Test. of Armour, Tr. vol. X at 21–22; Def's. Ex. 459.) Therefore, grades 5–12 were racially integrated at the school level.

Students in grades 1–4 attended one of four elementary schools—Balfour, Harper, Jerger, or Scott. During the 1970–76 time period, the percentage of black students in each school's population, with the possible exception of Harper, closely tracked the percentage of black students in the District as a whole.

| | Percentage of Black Students | | | | |
|---|---|---|---|---|---|
| School Year | District (1–4) | Balfour | Harper | Jerger | Scott |
| 1970–71 | 57.4 | 53.4 | 63.2 | 60.1 | 54.9 |
| 1971–72 | 62.4 | 58.3 | 72.1 | 68.8 | 56.1 |
| 1972–73 | 65.9 | 57.8 | 82.5 | 66.8 | 61.1 |
| 1973–74 | 67.8 | 64.7 | 83.2 | 68.9 | 59.2 |
| 1974–75 | 66.3 | 66.1 | 85.6 | 66.8 | 55.3 |
| 1975–76 | 67.9 | 73.0 | 87.3 | 63.5 | 56.1 |

(Pls.' Ex. 164.)

For a period of at least six consecutive years after the Desegregation Plan was implemented, all of the District's students in grades 1–4 attended a school that had a percentage of black students that varied no more than twenty percentage points from the district-wide percentage of black

18. The District percentage includes all students in grades K–12. While not exact, the Court finds this measurement to provide a reasonable approximation for the racial makeup of students in grades K–5 in the District.

students in those grades. (Test. of Armour, Tr. vol. X at 24; Pls.' Ex. 164; Def's. Exs. 546–49).

### a. Enrollment and Demographic Changes in the District

After the Desegregation Plan was implemented, the number of white students enrolled in the District declined substantially over a period of several years. (Test. of Armour, Tr. vol. X, at 33–35; Def's. Ex. 551). Meanwhile, black enrollment remained fairly stable. (Def's. Exs. 550–51; Pls.' Ex. 164). The enrollment in the District by race during the first eight years following the implementation of the Desegregation Plan was as follows:

| School Year | White | Black | Total | % Black |
|---|---|---|---|---|
| 1970–71 | 2274 | 2438 | 4712 | 51.74% |
| 1971–72 | 2018 | 2554 | 4572 | 55.86% |
| 1972–73 | 1888 | 2598 | 4486 | 57.91% |
| 1973–74 | 1614 | 2604 | 4218 | 61.74% |
| 1974–75 | 1492 | 2595 | 4087 | 63.49% |
| 1975–76 | 1468 | 2499 | 3967 | 62.99% |
| 1976–77 | 1459 | 2487 | 3946 | 63.03% |
| 1977–78 | 1311 | 2520 | 3831 | 65.78% |

(Pls.' Ex. 164.)

In addition to changes in school enrollment, the City of Thomasville also experienced population shifts after the implementation of the Desegregation Plan. In 1970, the black population in the City was concentrated primarily in the City's southwestern sector. (Test. of Armour, Tr. vol. X at 36; Def's. Ex. 553.) Since that time, the distribution of the black population throughout Thomasville has changed.

For example, in 1970, Harper Elementary School was surrounded by some predominantly white communities. (Test. of

Armour, Tr. vol. X at 37.) As the neighborhoods around Harper became increasingly black, so did Harper's student population.[19] Because of changes in the black population of the District and the City of Thomasville, demographics overtook the Desegregation Plan and Harper's enrollment became increasingly black. (Test. of Armour, Tr. vol. X at 41–42). In fact, Harper's variance from the district-wide percentage of black students went from approximately 6% in 1970 to almost 20% in 1975, while the other elementary schools' black enrollment during that period varied no more than 11% from the district-wide black enrollment for the elementary grades. The growing variance at Harper caused HEW concern.

### b. HEW's Intervention Regarding Disproportion at Harper Elementary School

On May 13, 1975, HEW addressed a letter to the District's Superintendent advising that a United States District Court, in the case of Adams v. Weinberger, 391 F.Supp. 269 (D.D.C.1975), had ordered HEW to put school districts on notice "to rebut or explain the substantial racial disproportion in one or more of the district's schools." (Def's.Ex. 456.) In its letter to the District, HEW stated: "The court defined a racially disproportionate school as one in which a '20 percent disproportion exists between the percentage of local minority pupils in the schools and the percentage in the entire school district.'" (Def's.Ex. 456.)

This letter prompted several exchanges between the District and HEW. (Def's. Exs. 456, 458, 459, 461, 464, 466, and 467.) In response to HEW's inquiry, the District

---

**19.** By 1980 the area around Harper had become almost entirely black and by 1990 there were few, if any, white students left in the area. (Test. of Armour, Tr. vol. X at 38–40; Def's. Exs. 554–55.)

provided HEW with the following explanation of its student assignment procedure:

Assignments are based upon freedom of choice, modified only to the extent hereinafter stated. Freedom of choice forms are issued to all pupils each year. If a school reaches its capacity, priority is given to the child nearest the school. If a parent or student fails to return the form, the student is assigned by school officials to the school nearest the student's home which has not been filled to capacity. In order to maximize a biracial complexion in the Harper School, freedom of choice is modified in two respects: (a) Whites residing in the Harper area have been required to attend Harper notwithstanding their selection of another school under freedom of choice[;] (b) Priority has been given to whites desiring to attend Harper as against blacks residing closer to the school.

(Def's.Ex. 467.)

After receiving this explanation along with other information, HEW "determined that no further student desegregation is required of [the District] at this time." (Pls.' Ex. 350 at 2.) On November 17, 1975, HEW found the District "in compliance with Title VI of the Civil Rights Act of 1964 relative to assignment of students ... to schools." (Pls.' Ex. 350.)[20] However, HEW also noted that the situation at Harper warranted monitoring. (Pls.' Ex. 350.)

c. *Increasing Racial Imbalances After 1977*

Beginning in 1977, racial imbalances in the District's elementary schools gradually began to increase. No formal plan was adopted by the District during the period between 1977 and 1995 to address these

racial imbalances. In 1994, the District did create a task force to address these concerns and make recommendations regarding the assignment of students to elementary schools. (Test. of Sabrina Boykins–Everett, Tr. vol. X at 234). The task force consisted of an equal number of black and white members. (Test. of Sabrina Boykins–Everett, Tr. vol. X at 234). After several meetings, the group reached a consensus in 1995 and made its recommendation regarding the process for assigning students to elementary schools. (Test. of Boykins–Everett, Tr. vol. X at 234–35; Pls.' Ex. 600.)

With only a few modifications, the process for assigning students to elementary schools recommended by the task force in 1995 has been used by the District since that time. (Test. of Boykins–Everett, Tr. vol. X at 219, 227.) If space allows, a student is now assigned at the kindergarten level in accordance with the stated preference of the student's parents. (Test. of Boykins–Everett, Tr. vol. X at 221–24.) If space does not allow the preferences of all parents to be accommodated, students are initially assigned to elementary schools in accordance with the following priority system: (1) special education considerations; (2) placement with siblings; (3) residents of the City of Thomasville; (4) proximity among residents of the City of Thomasville; (5) non-residents of the City of Thomasville; and (6) proximity of non-residents of the City of Thomasville. (Test. of Boykins–Everett, Tr. vol. X at 225–29.) After students are assigned to a school, they remain at that school for the remainder of their elementary school careers unless their parents request a transfer. (Test. of Boykins–Everett, Tr. vol. X

---

**20.** Plaintiffs' desegregation expert, William M. Gordon, agreed that the District was in compliance with Title VI relative to the assignment of students as of November 17, 1975. (Test. of Gordon, Tr. vol. IV at 110.)

at 230–31). If such a request is made, and if space allows, a priority system closely mirroring the system followed for assigning kindergarten students is used. (Test. of Boykins–Everett, Tr. vol. X at 231–32.) Exceptions for critical medical needs and other hardships are made both for initial assignments to elementary schools and for transfers. (Test. of Boykins–Everett, Tr. vol. X at 237.)

### d. Causes of Current Racial Imbalances

As described above, the current student populations of the District's elementary schools do not track the student population in the District. Harper and Jerger are clearly racially identifiable schools. Based upon the evidence presented at trial, the Court finds that the racial composition of the District's elementary schools is currently "imbalanced" because of changes in the racial makeup of the City of Thomasville, shifting housing patterns, and changes in the enrollment of the District's schools caused by declining white enrollment as compared to black enrollment. The Court finds that the current racial imbalances of the District's elementary schools are not due to any intentional discrimination on the part of the District and are not vestiges of the District's previous *de jure* racially segregated system.

### 2. Racial Imbalances in Classes within Schools

Plaintiffs also contend that individual classes within the District's schools are segregated on the basis of race. In support of this contention, Plaintiffs presented evidence at trial that many of the less

academically advanced classes in the District's schools are predominantly black while most of the more academically advanced classes are predominantly white. The Court finds that Plaintiffs presented sufficient evidence of racial imbalances in certain classes to require the District to rebut the presumption that those imbalances are traceable to the District's previous *de jure* segregated system. The Court finds that the District has carried its burden.

The Court finds that the current racial imbalances in individual classes are a result of the District's educational policy of "ability grouping" or "tracking." The District attempts to group students based upon their perceived ability starting in kindergarten. Regrettably, a disproportionate number of low income children (most of whom happen to be black) are placed in the lower ability groups. The Court finds that these placements are not being made due to the race of the student. Many of these low income students are simply perceived as not being prepared when they first arrive at school. Due to their impoverished environment, they do not receive the background and support that is often so critical for being ready to learn.[21] Tragically, it appears that for many of these children, the "die is cast" as early as kindergarten. These children do not appear to be reevaluated (and thus potentially "re-tracked") during their progression through the system. The inevitable result therefore is that they remain on the "lower ability" track for the duration of their educational careers, absent parental intervention.[22]

---

**21.** The Court makes no finding as to whether some placements may be affected by the subtle racism of low expectations. However, the Court does find that intentional racial discrimination is not the reason for placement decisions.

**22.** Tracking, although considered a sound established educational practice by many, is controversial among educators and certainly beyond the realm of expertise of the judicial branch. As observed by one court,

At the middle school level, students are assigned to classes based upon the performance level recommendations of their teachers from the preceding year, as well as test scores, and when reasonably accommodated, parent requests. (Test. of Cheryl Hay, Tr. vol. XI at 50, 53–56, 60, 63.) Students entering middle school are first assigned to teams that consist of students from all the elementary schools with each team being balanced as closely as possible with regard to race, gender, and performance levels. (Test. of Hay, Tr. vol. XI at 53–59.) However, after the teams are formed, students are assigned to classes based upon performance level. Therefore, students generally attend classes with students of comparable academic ability. (Test. of Hay, Tr. vol. XI at 53–59.)

In high school, students choose their courses within the limits imposed by the District's tracking system. Parents and teachers also offer input into what classes students should take. (Test. of Bobby Smith, Tr. vol. XII at 104–07.) Unfortunately, if a child is "tracked" in a lower level in elementary school and does not have an active and engaged parent, the District's system perpetuates that student's original track, so that they tend to be tracked in the lower level in middle school, and thus are not prepared for higher level courses in the high school.

When the racial makeup of a community correlates directly with poverty and when poverty correlates with perceived academic readiness, as it does in Thomasville, this "ability tracking" inevitably leads to ability groups that are racially imbalanced.[23] Although the Court finds that the District's tracking system has had the effect of creating racially imbalanced classes within the District's schools, the Court finds that it was not the intention of the tracking system to segregate students based upon race. Moreover, the Court finds that the District does not manipulate the ability tracking system in order to track students based upon their race.

### 3. The District's Faculty

■ The racial breakdown of faculty in the District's elementary schools for the most recent four school years is as follows:

| | Percentage of Black Faculty | | | |
| --- | --- | --- | --- | --- |
| School Year | District | Harper | Jerger | Scott |
| 1999–2000 | 36.0 | 68.0 | 9.7 | 24.2 |
| 2000–01 | 32.4 | 65.2 | 10.8 | 18.2 |
| 2001–02 | 29.7 | 76.2 | 8.6 | 8.3 |
| 2002–03 | 26.0 | 58.8 | 8.8 | 11.1 |

(Pls.' Ex. 164.) The Court finds that the District's faculty is currently racially imba-

---

Tracking is a controversial education policy, although just grouping students by age, something no one questions, is a form of "tracking." Lawyers and judges are not competent to resolve the controversy. The conceit that they are belongs to the myth of the legal profession's omnicompetence that was exploded long ago. To abolish tracking is to say to bright kids, whether white or black, that they have to go at a slower pace than they're capable of; it is to say to the parents of the brighter kids that their children don't really belong in the public school system; and it is to say to the slower kids, of whatever race, that they may have difficulty keeping up, because the brighter kids may force the pace of the class.
*People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 536 (7th Cir.1997).

23. Evidence presented at trial demonstrates that the greater the percentage of black students in an elementary school the lower that school's students score on standardized tests compared to those schools with a lower percentage of black students. (Pls.' Exs. 532, 566, 704, 819, 885, 960.) Since standardized tests are a significant ability grouping tool, they contribute to the racial imbalances existing in many individual classes.

lanced.[24] This racial imbalance, however, is not traceable in a proximate way to the District's previous *de jure* segregated system.

In fact, the District made remarkable progress in completely desegregating its faculty following the implementation of the 1970 Desegregation Plan. For grades 5–12, only one school served each grade under the Desegregation Plan. Therefore, all stu-dents in these grades were taught by the same faculty. (Test. of Armour, Tr. vol. X at 21–22.) As previously noted, all stu-dents in grades 1–4 attended one of four elementary schools under the Desegrega-tion Plan. The following chart shows the percentage of black elementary faculty members in the District for the years indi-cated with the corresponding percentage of black faculty in each of the elementary schools:

| | Percentage of Black Faculty | | | | |
|---|---|---|---|---|---|
| School Year | District | Balfour | Scott | Jerger | Harper |
| 1970–71 | 44.2 | 42.9 | 43.5 | 31.3 | 45.5 |
| 1971–72 | 43.4 | 46.2 | 36.4 | 37.5 | 45.5 |
| 1972–73 | 47.3 | 46.2 | 42.1 | 40.0 | 54.5 |
| 1973–74 | 43.2 | 42.9 | 36.8 | 35.3 | 41.7 |
| 1974–75 | 45.7 | 42.9 | 36.8 | 41.2 | 54.5 |
| 1975–76 | 41.1 | 40.0 | 40.0 | 41.2 | 45.5 |
| 1978–79 | 41.1 | 35.7 | 42.9 | 37.5 | 38.5 |
| 1979–80 | 43.3 | 38.5 | 40.9 | 35.3 | 46.2 |
| 1980–81 | 39.3 | 36.4 | 39.1 | 35.3 | 42.9 |
| 1982–83 | 36.2 | 30.8 | 43.5 | 35.3 | 35.7 |

(Pls.' Ex. 164.)

This chart demonstrates that for a peri-od of ten consecutive school years after the Desegregation Plan was implemented, all of the District's students in grades 1–4 attended a school that had a percentage of black faculty members that varied no more than fifteen percentage points from the district-wide percentage of black elementa-ry faculty members for the grade levels served by these schools. (Test. of Arm-our, Tr. vol. X at 51–56; Def's. Exs. 552a, 552b, 552c, 552d; Pls.' Ex. 164.)

The Court finds that the District's De-segregation Plan effectively desegregated the District's faculty.[25] The Court further finds that the District's faculty assignment system from 1983 to the present has not been administered in a racially discrimina-tory manner and that the system is pres-ently administered without regard to race. Under the current system, teachers are assigned to teach at a particular elementa-ry school after being interviewed and rec-ommended by the principal of that school. (Test. of Gordon, Tr. vol. IV at 283–84.)

**24.** The Court finds that the appropriate stan-dard to be applied in determining whether a school is racially identifiable based upon its faculty is whether the percentage of black faculty members at the school varies from the district-wide percentage of black faculty members for the grade levels served by the school by plus or minus fifteen percentage points. (Test. of Armour, Tr. vol. X at 52–53.)

**25.** On November 17, 1975, HEW found the District "in compliance with Title VI of the Civil Rights Act of 1964 relative to assignment of ... faculty to schools." (Pls.' Ex. 350 at 2.) Plaintiffs' expert, William M. Gordon, testified that he agreed that, as of November 17, 1975, the District was in compliance with Title VI of the Civil Rights Act of 1964 regarding faculty assignment. (Test. of Gordon, Tr. vol. IV at 110.)

There are no significant differences between the education levels and experience of the faculties of the District's elementary schools. (Test. of Calvin Brown, Tr. vol. XII at 150–53.) Based on the foregoing, the Court finds that any racial imbalances that presently exist regarding the District's faculty are not traceable to the *de jure* segregated system or to current racial discrimination.

### 4. *Staff: Principals and Assistant Principals*

The Court is reluctant to make any findings regarding current racial imbalances in the District's staff because of the limited evidence presented on this issue at trial. The racial breakdown for principals and assistant principals for the most recent school year available, 1994–95, is as follows:

| School | Principal/Asst. Principal |
| --- | --- |
| Jerger (K–5) | W |
| Harper (K–5) | W |
| Scott (K–5) | W |
| MacIntyre Park | B/W |
| Thomasville High | W/BW |

(Pls.' Ex. 164.) The Court finds that any minimal imbalance that presently exists is not traceable in a proximate way to the *de jure* segregation that existed in the District prior to the implementation of its Desegregation Plan.

At the time the Desegregation Plan was implemented, there were only two black principals in the District, both of whom worked at the elementary school level. (Pls.' Ex. 164.) Pursuant to the Desegregation Plan, one of the black principals was assigned to the district-wide grade 5 school, East Side, while the other was assigned to the district-wide grade 6 school, Dunlap. (Pls.' Ex. 164.) These assignments assured that all students would attend at least one school with a white principal (grades 1 to 4) and two schools with black principals (grades 5 and 6). (Pls.' Ex. 164.) Principals were assigned at the middle and high school levels such that all secondary students attended schools with both black and white principals and black and white assistant principals. (Pls.' Ex. 164.) The Desegregation Plan effectively desegregated the District's staff, and after its implementation, no school in the District was racially identifiable based upon its staff. The Court finds that, if the current breakdown of staff is deemed imbalanced, that imbalance is not a vestige of the *de jure* segregated system.

### 5. *Curriculum and Assignment of Students to Classes*

Plaintiffs also contend that the District discriminates on the basis of race in its assignment of students to various classes within grades and that this class assignment system results in different curriculum being used in the different racially identifiable classes. The Court has previously addressed the District's class assignment system and found that some classes are racially imbalanced due to "ability tracking," not racial discrimination.[26] The Court further notes that the District uses the State of Georgia Quality Core Curriculum ("QCC") in all of its schools. (Test. of James Cable, Tr. vol. XI at 217.) Therefore, to the extent that different curriculum is used depending upon the ability level of the class, the Court finds that no racial discrimination exists.

### 6. *The Gifted Program*

The District operates a Gifted Program for students who meet the criteria for admission established by the Georgia De-

---

26. *See supra* Part II.B.2.

partment of Education.[27] (Test. of Susan Haggerty, Tr. vol. XII at 55; Def's. Ex. 951.) Plaintiffs suggest that blacks are under-represented in the District's Gifted Program. A statistical analysis of the students participating in the program arguably reveals a disproportionate number of whites in the Gifted Program compared to their overall representation in the school population. (Test. of Haggerty, Tr. vol. XII at 86–92; Pls.' Ex. 1064–69; Def's. Exs. 257–63.) However, the Court finds that no student has been admitted to the District's Gifted Program without satisfying the criteria established by the Georgia Department of Education. (Test. of Haggerty, Tr. vol. XII at 62.) Furthermore, the Court finds that no student who has satisfied the Georgia Department of Education's criteria for the Gifted Program has been denied the opportunity to participate. (Test. of Haggerty, Tr. vol. XII at 62–63.) All decisions made with respect to admission have been in accordance with the controlling Georgia Department of Education's regulations. (Test. of Haggerty, Tr. vol. XII at 55–63.) Finally, the Court finds that no student has ever been denied an opportunity to participate in the Gifted Program because of race. (Test. of Haggerty, Tr. vol. XII at 63.)

If a student does not meet the state eligibility requirements for the Gifted Program, the District does not receive funding from the State of Georgia for the time such a student is in gifted classes. (Test. of Cable, Tr. vol. XI at 238.) Even so, the District allows certain students to at-tend gifted classes upon the recommendation of their teachers. (Test. of Cable, Tr. vol. XI at 238–39). The evidence showed that most of the students who attend gifted classes without meeting the criteria of the Georgia Department of Education are black. (Test. of Cable, Tr. vol. XI at 239–40.)

The Court finds that the District does not discriminate on the basis of race with respect to its Gifted Program. Moreover, no current racial imbalance with respect to the Gifted Program is traceable, in a proximate way, to the *de jure* segregation that once existed in the District.

7. *Special Education*

Plaintiffs also contend that the District discriminates on the basis of race in the operation of its Special Education Program. The Court finds to the contrary. Plaintiffs presented evidence that arguably showed a disproportionate number of black students are included in the Special Education Program. (Pls.' Exs. 1064–68.) However, the Court finds that these racial imbalances are not attributable to racial discrimination and are not vestiges of the previous *de jure* system.

The Court notes that the District is governed by a myriad of state and federal regulations related to the administration of its Special Education Program. Due process protections exist throughout the process. Based on the evidence presented at trial, the Court finds that the District reasonably complies with these regulations.

---

**27.** Under Georgia Department of Education regulations, a student meets the initial eligibility requirements for the Gifted Program if he or she either:

(a) score[s] at the 99th percentile (for grades K–2) or the 96th percentile (for grades 3–12) on the composite or full scale score of a standardized test of mental ability and meet[s] one of the achievement crite-ria [described in the regulations], or (b) qualif[ies] through a multiple-criteria assessment process by meeting the criteria in any three of the following four areas: mental ability (intelligence), achievement, creativity and motivation.

Ga. Dep't of Educ. Reg. 160–4–2–.38, included in the record as Def's. Ex. 951.

Eligibility for the District's Special Education Program is determined by rules and regulations issued by the Georgia Department of Education (Test. of Haggerty, Tr. vol. XII at 66–67; Def's. Ex. 950.) as well as by the procedures outlined in the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C.A. §§ 1400–87. The Court finds that the District attempts to follow both state and federal law when making initial special education eligibility decisions.

The Court also notes that parents have certain rights with respect to their child's placement and continued participation in the Special Education Program. (Test. of Haggerty, Tr. vol. XII at 72.) It is the practice of the District to notify parents of their rights in writing when making eligibility determinations. (Test. of Haggerty, Tr. vol. XII at 72–73.) Parents can contest any eligibility decision that is made with respect to their child. (Test. of Haggerty, Tr. vol. XII at 73.) However, it appears based upon the evidence presented at trial that no parent in the District has contested any eligibility decision made with respect to his or her child. (Test. of Haggerty, Tr. vol. XII at 74.) It is undisputed that a student cannot be placed in special education without consent of the child's parents. (Test. of Haggerty, Tr. vol. XII at 75.)

As with eligibility, parents have the right to contest the special education services that are offered to their child by the District. Specifically, parents can request a hearing with respect to the propriety of these services. (Test. of Haggerty, Tr. vol. XII at 75–76.) No parent has contested the special education services that have been provided to a student by the District. (Test. of Haggerty, Tr. vol. XII at 76.) The Court also observes that a student is not required to remain in special education indefinitely. (Test. of Haggerty,

Tr. vol. XII at 76.) Parental consent is required for a child to continue in the Special Education Program. (Test. of Haggerty, Tr. vol. XII at 78.)

The evidence at trial also demonstrated that the District, in accordance with state and federal law, re-evaluates children at least every three years to determine continued eligibility for the Special Education Program. (Test. of Haggerty, Tr. vol. XII at 78.) Reevaluations are done more frequently if requested by the parents. (Test. of Haggerty, Tr. vol. XII at 78–79.) Parents have the same rights to contest decisions made by the District with respect to reevaluations that they have with respect to all other special education matters. (Test. of Haggerty, Tr. vol. XII at 79.)

The Court finds no evidence in the record to suggest that any student has been placed in special education in the District unless the requirements imposed by state and federal law have been satisfied. (Test. of Haggerty, Tr. vol. XII at 80.) Furthermore, the Court finds that race has not been a factor in any decision made by the District regarding placement of children in the Special Education Program. (Test. of Haggerty, Tr. vol. XII at 80.) Finally, the Court finds that any current racial imbalance in the District with respect to special education is not traceable, in a proximate way, to the *de jure* segregation that once existed in the District.

### 8. Discipline

Plaintiffs also contend that the District engages in racial discrimination regarding the administration of discipline to its students. Assuming but not deciding that a statistically greater percentage of black students have been subjected to disciplinary action when compared to white students, the Court finds that the District does not treat black students differently

from white students with respect to discipline. (Test. of Gene Christie, Tr. vol. XI at 173–75; Test. of Bobby Smith, Tr. vol. XII at 108.) Specifically, the Court finds, based upon the evidence presented at trial, no incident in which a black student received a harsher punishment than a white student for the same or similar misconduct. (Test. of Smith, Tr. vol. XII at 108.) Furthermore, the Court finds that the District does not treat black students differently from white students with respect to referrals for discipline. (Test. of Christie, Tr. vol. XI at 173.) No evidence was presented at trial by Plaintiffs to refute Defendant's evidence that no black student has received a referral for punishment where a white student did not under the same or similar circumstances. (Test. of Christie, Tr. vol. XI at 173–74.)

The Court finds that race has not been a factor in any decision made by the District with respect to discipline. Moreover, any current racial imbalance in the District with respect to discipline is not traceable, in a proximate way, to the District's *de jure* segregated system.

## C. Areas of Alleged Discrimination Where No Current Racial Imbalances Are Found

In contrast to the areas discussed in the previous section, the Court finds no present racial imbalances in the areas of facilities, transportation, and extracurricular activities. Nevertheless, for the sake of completeness, the Court evaluates these areas to determine whether the District has engaged in purposeful racial discrimination in any of them.

### 1. The District's Facilities

The Court finds that no racial imbalances favoring white students exist as to the District's facilities. Since all middle and high school students attend the same schools regardless of their race, there can certainly be no legitimate claim that any imbalance exists regarding these facilities. Regarding the elementary schools, the Court finds it persuasive, albeit not dispositive, that all of the District's elementary schools are accredited by the Southern Association of Colleges and Schools ("SACS"). (Test. of Cable, Tr. vol. XI at 216–17.) In order to receive SACS accreditation, a school must meet standards established by SACS, including several relating to the school's physical facilities. (Test. of Cable, Tr. vol. XI at 216.) The three elementary schools in the District currently meet all SACS standards.[28] (Test. of Cable, Tr. vol. XI at 216–17.)

The Court also finds that Harper and Scott, which are majority black, do not have fewer resources (such as computers, televisions, video cassette recorders, and reading materials available to students in their media centers) than Jerger. (Test. of Cable, Tr. Vol. XI at 190–93; Def's. Ex. 863.)

The Court further finds that the District, in its funding for facilities, does not discriminate on the basis of race. The District receives a percentage of its funds from the State of Georgia. (Test. of Cable, Tr. vol. XI at 195; Def's. Ex. 859.) The amount of state funds received for a particular school is determined by the number of students attending the school. (Test. of Cable, Tr. vol. XI at 199.) The District supplements state funds with local funds and receives additional funding from

---

**28.** Plaintiffs' own desegregation expert testified that, with respect to the three elementary schools in the District, the physical plants of Harper and Scott, the schools that have majority black student populations, are superior to that of Jerger, the school that has a majority white population. (Test. of Gordon, Tr. vol. IV at 268–69.)

various grants. (Test. of Cable, Tr. vol. XI at 202–03.) Race plays no factor in the receipt or use of this funding.

The District also receives supplemental federal funds through the Title I program. This program provides federal funds for assistance with students who are performing at lower levels. (Test. of Cable, Tr. vol. XI at 208.) Funds from the Title I program are not available for all schools. Specifically, Jerger, the District's majority white school, does not receive such funding. (Test. of Cable, Tr. vol. XI at 209.) Including Title I funds, the operating budgets for the elementary schools at Harper and Scott are substantially greater than those for Jerger. (Test. of Cable, Tr. vol. XI at 211–13.) Without Title I funds, the amount spent per pupil at all three schools would be roughly equivalent. (Test. of Cable, Tr. vol. XI at 213.)

In summary, the Court finds that the District does not discriminate on the basis of race with regard to the funding or use of its facilities.

### 2. Transportation

Independent school systems in Georgia are not required to transport regular education students. (Test. of Cable, Tr. vol. XI at 235–36.) Prior to the 2002–03 school year, the District had only a limited transportation system, which was used to transport special education students and students participating in athletic events, extracurricular activities, and field trips. (Test. of Cable, Tr. vol. XI at 236.) At the beginning of the 2002–03 school year, the District initiated a very limited route for the transportation of Harper students who had previously been assigned to Douglass before it closed. (Test. of Cable, Tr. vol. XI at 236.) Douglass had a student population which was one hundred percent black, as discussed above. Therefore, the Court finds that the students transported to Harper under the District's new program were predominantly black.

Since no white students receive transportation services from the District and some black students do, the Court finds the District does not discriminate against blacks on the basis of race with respect to transportation. The Court further finds that no undue burden is placed on black students with regard to the distance they must travel to school under the District's current student assignment plan.

### 3. Extracurricular Activities

All District extracurricular activities are available to all of the District's students without regard to race. (Test. of Cable, Tr. vol. XI at 184–85; Test. of Bobby Smith, Tr. vol. XII, at 99–104.) The Court finds no present racial imbalances in the District's extracurricular programs. Even if the Court accepted Plaintiffs' argument that imbalances presently exist, it is clear that the District carried its burden of establishing that any such imbalances are not traceable in a proximate way to the District's previous de jure system; nor are they the result of presently practiced racial discrimination.

### III. CONCLUSIONS OF LAW

Plaintiffs' claims are brought pursuant to 42 U.S.C.A. § 1983 and Title VI of the Civil Rights Act of 1964. Under § 1983, Plaintiffs must prove a constitutional violation caused by a policy or custom of Defendant. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In this case, Plaintiffs contend that Defendant has maintained a racially segregated school system in violation of their Fourteenth Amendment rights to equal protection. To establish such a constitutional violation, the evidence must be sufficient to support a finding that Defendant has engaged in intentional dis-

crimination based upon race. *See, e.g., Washington v. Davis*, 426 U.S. 229, 238–42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Keyes*, 413 U.S. at 205, 93 S.Ct. 2686. If its actions are found to violate Plaintiffs' rights to equal protection, Defendant will also be liable under Title VI. *See Gratz v. Bollinger*, 539 U.S. 244, 123 S.Ct. 2411, 2430 n. 23, 156 L.Ed.2d 257 (2003) ("[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI."). Therefore, the Court's first inquiry is whether Defendant operates an intentionally segregated school system based upon race or has otherwise engaged in purposeful racial discrimination.

■ When a school district has previously operated a *de jure* segregated system, a district court must first determine whether any vestiges of the previous *de jure system* still exist before turning to whether the school district presently engages in racial discrimination unrelated to the previous *de jure* segregated system. As part of its analysis in the case *sub judice*, the Court has considered the *Green* factors as well as certain ancillary factors.[29] The Court has found it helpful for analytical purposes to examine these areas based upon whether racial imbalances presently exist with regard to the specific area.

■ For those areas in which the Court has found current racial imbalances, there is a presumption that those racial imbalances are vestiges of the District's previous *de jure* segregated system, and Defendant bears the burden of rebutting that presumption by proving by a preponderance of the evidence that the racial imbalances are not traceable in a proximate way to the previous *de jure* segregated system. *Keyes*, 413 U.S. at 218, 93 S.Ct. 2686; *N.A.A.C.P., Jacksonville Branch v. Duval County School*, 273 F.3d 960, 966–67 (11th Cir.2001), *reh'g en banc denied* 31 Fed. Appx. 943, 2002 WL 338731 (11th Cir.2002) (tbl.opin.). If these imbalances are not traceable to the previous *de jure* segregated system, then the Court must determine whether they are the result of current, intentional racial discrimination. Similarly, for those areas in which the Court has found no present racial imbalances, the Court must ascertain whether the District presently engages in purposeful racial discrimination in violation of the Fourteenth Amendment and Title VI.

### A. Areas in Which Racial Imbalances Currently Exist [30]

The Court previously found that racial imbalances arguably exist at present as to:

---

**29.** As previously indicated, the areas examined by the Court in its findings of fact (student assignments, facilities, faculty and staff assignments, transportation, and extracurricular activities) coincide with those outlined by the Supreme Court in *Green v. County School Board*, 391 U.S. at 435, 88 S.Ct. 1689, as factors to be used by courts when determining whether a school system has effectively eliminated the vestiges of its previous *de jure* segregated system. *See also N.A.A.C.P., Jacksonville Branch*, 273 F.3d at 966. In addition to the *Green* factors, the Court evaluated the District's curriculum and class assignments, gifted and special education programs, and discipline system.

**30.** Defendant seeks to have this Court declare that the District was "unitary" as of 1975 when the federal government concluded that it no longer operated a dual school system. Under this argument, a finding that the District was unitary as of 1975 would sever any tie between the current system and its *de jure* segregated past, thus relieving the Court of making any determinations as to whether any imbalances occurring after 1975 are traceable in a proximate way to the previous *de jure* system. Plaintiffs respond that "unitary status" has a precise legal definition under school desegregation jurisprudence and can only be declared after a legal finding, presumably by a court, that a system was, in fact, a

(1) the racial composition of the District's elementary schools; (2) the racial composition of the elementary schools' faculty and staff; (3) the racial composition of some individual classes; (4) the Gifted Program; (5) the Special Education Program; and (6) the administration of discipline. However, the Court also found that the District carried its burden of proving that the racial imbalances in these areas were not traceable in a proximate way to its previous *de jure* segregated system. The Court also found that current purposeful discrimination did not proximately cause these imbalances. Therefore, since these imbalances are not vestiges of the previous *de jure* segregated system and are not the proximate result of presently practiced racial discrimination, they do not support a claim under either the Fourteenth Amendment or Title VI.

### B. Areas in Which No Racial Imbalances Currently Exist

The Court found no present racial imbalances in the following areas: (1) facilities; (2) extracurricular activities; and (3) transportation. Since one could conceivably engage in racial discrimination in these areas and yet not create racial imbalances, the Court analyzed whether the District engaged in racial discrimination in these areas notwithstanding the Court's finding that racial imbalances do not exist. The Court concluded that as to these areas

there is no indication of intentional racial discrimination on the part of the District. Accordingly, Plaintiffs' rights under the Equal Protection Clause and Title VI have not been violated in these areas.

### IV. SUMMARY OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

Any racial imbalances that presently exist in the District are not traceable in a proximate way to the District's previous *de jure* racially segregated system. Moreover, based upon the evidence presented at trial, the Court finds that the District does not presently discriminate on the basis of race in any aspect of its operations. Therefore, the Court concludes that the District has not violated the Fourteenth Amendment to the Constitution or Title VI of the Civil Rights Act of 1964. Accordingly, Plaintiffs are not entitled to the relief they seek.

### V. FINAL THOUGHTS

Fifty years ago the Supreme Court decided *Brown v. Board of Education.* During this golden anniversary year, celebrations, conferences, and symposia will appropriately commemorate this landmark decision. Politicians will pontificate. Professors will educate. Many will reminisce. Much progress has been made. Legislatures no longer codify racial segregation in the statute books. Governors do not

---

*de jure* segregated system. Since Defendant has never been found by a court to have operated a *de jure* segregated school system, Plaintiffs maintain that it is premature to award it "unitary status," meaning it has achieved all of the desegregation objectives set forth in a court's remedial desegregation order. To avoid confusing terminology, the Court has refrained from using the terms "unitary" or "unitary status" in describing its findings and conclusions in this case. Moreover, for purposes of this Order, the Court does not accept Defendant's argument that

the Court must ignore any racial imbalances occurring after 1975 in determining whether they are traceable to the previous *de jure* segregated system. The Court does, however, find the degree to which the District desegregated its system upon the implementation of its Desegregation Plan in 1970 to be relevant in the Court's determination as to whether the District has carried its burden of proving that any current racial imbalances are not traceable in a proximate way to the *de jure* segregated system that existed prior to the District's implementation of that plan.

stand in schoolhouse doors. Black and white children share desks, teachers, and water fountains.

Notwithstanding this progress, many poor children are still waiting on the promise of *Brown*—a promise of educational opportunity for every American. Regrettably, as some of the evidence in this case demonstrates, this promise has not been fulfilled for many children who find themselves trapped in an educational system that cannot meet their needs. This Court has no hesitation in finding that the educational system in Thomasville, Georgia, like that in many parts of this country, is not reaching many students, particularly those whose parents happen to be poor. Because of this failure, which the Court hastens to add cannot be blamed entirely upon the many dedicated teachers and administrators in the District, too many children will never realize their full potential. We can put a man on the moon. We can communicate with someone on the other side of the globe with a click of a finger. Yet, we have trouble teaching a poor child to read or do arithmetic.

No matter how tempted the Court may be to intervene and attempt to "fix the system," a court is ill-equipped for such a task. Moreover, it does not have the authority to act as a super-school board or social scientist, even if it was arrogant enough to believe that it possessed the ability. It can only remedy violations of federal law. The Court has located no provision in the Constitution or accepted principle of federal law that mandates that

poor children be guaranteed a high quality education.[31]

The Constitution does require that school systems not engage in intentional discrimination on the basis of race. While the record in this case establishes that many poor black children in Thomasville, Georgia are not receiving what this Court would consider an adequate education, the record is clear that Defendant has not engaged in intentional discrimination based upon race. Therefore, this Court does not have the authority to grant the relief sought by Plaintiffs. *Brown* and its progeny support no other conclusion. Accordingly, based upon the findings of fact and conclusions of law set forth in this Order, judgment must be, and is hereby, entered in favor of Defendant.

---

**31.** Under our system of government, the people through their elected representatives ultimately determine the extent of educational opportunity available to their fellow citizens. Those who have no political voice must depend upon those who do. While it is truly regrettable that this voice is too often muffled in the political process, its silence cannot authorize intervention by the federal courts absent a violation of federal law. The Court expresses no opinion as to whether a cause of action would exist for a disparity in educational opportunity between poor children and wealthier children. That issue is not before the Court. *See* Pls.' Resp. to Interrogs. Propounded by the Court (tab 150).